UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

LADORN SINGER,

        Plaintiff,

v.                                       Case No. 3:19-cv-729-BJD-PDB

ANDREW GAMBEL, et al.,

        Defendants.
_____

## ORDER

Defendants Gambel, Tucker, and Williams jointly move for entry of summary judgment in their favor under Rule 56 of the Federal Rules of Civil Procedure (Doc. 47; Motion).[1] In support of their motion, Defendants offer deposition transcripts of Plaintiff, a former inmate of the Florida Department of Corrections (FDOC), and Johnny Haugabook, an inmate of the FDOC who witnessed the events (Docs. 47-1, 47-2; Def. Exs. A, B).

In response to the motion, Plaintiff offers evidence[2] of the following: Defendant Gambel (then a Sergeant), in the presence of Defendants Tucker

---

[1] Counsel notes he seeks summary judgment in favor of Defendants Garrison and Reed as well. See Motion at 1 n.1. However, as counsel acknowledges, Plaintiff dismissed those Defendants without prejudice well before the dispositive motion deadline. See Orders (Docs. 40, 42).

[2] Plaintiff submits a copy of the Florida Department of Law Enforcement (FDLE) investigative report, deposition transcripts, and a photo (Docs. 48-1 through 48-11). The exhibits will be cited as "Pl. Ex." followed by the letter designation

and Williams (corrections officers), told inmates in Plaintiff's dorm that there was a "snitch" amongst them; Defendant Gambel said to the inmates, "if you can't handle your house, then we will take it out on everyone in the dorm"; some inmates interpreted Defendant Gambel's statement to mean "the inmates should deal with the complaining Inmate"; Defendant Gambel, with Defendants Tucker and Williams, told another inmate the snitch was Plaintiff, and Plaintiff was brutally beaten shortly thereafter; Defendant Williams was present in the dorm when multiple inmates beat Plaintiff, but he did nothing; and Defendant Williams knew Plaintiff was in dire need of medical attention but refused to get help for him. See Def. Ex. B at 34-35, 37, 52, 55-56, 58; Pl. Ex. D at 15, 39, 52, 56, 82, 103, 106; Pl. Ex. G at 62.

Defendants maintain these facts, accepted as true, do not demonstrate deliberate indifference under the Eighth Amendment. See Motion at 7-9, 10, 13. Defendants are incorrect. Prison guards have a duty under the Eighth Amendment to "take reasonable measures to guarantee the safety of the inmates," which includes protecting them from other inmates and ensuring they receive constitutionally adequate medical care. Farmer v. Brennan, 511 U.S. 825, 832 (1994). See also Caldwell v. Warden, FCI Talladega, 748 F.3d

---

Plaintiff assigns to each (A-G, J, O, U, and X). Page numbers are those assigned by the Court's electronic filing system.

1090, 1102 (11th Cir. 2014) ("[A] prison guard violates a prisoner's Eighth Amendment right when that guard actually (objectively and subjectively) knows that one prisoner poses a substantial risk of serious harm to another, yet fails to take any action to investigate, mitigate, or monitor that substantial risk of serious harm."); Ancata v. Prison Health Servs., Inc., 769 F.2d 700, 704 (11th Cir. 1985) ("The knowledge of the need for medical care and intentional refusal to provide that care has consistently been held to surpass negligence and constitute deliberate indifference.").

If true that Defendant Gambel, in the presence of Defendants Tucker and Williams, threatened inmates their personal belongings would be searched or destroyed if they did not "take care" of the snitch and then disclosed to one inmate that Plaintiff was the snitch, a jury could find Defendants were deliberately indifferent to a serious risk of harm. Additionally, if true that Defendant Williams heard or watched the beating but did nothing to stop it and either personally observed Plaintiff's injuries or heard about Plaintiff's condition but refused to summon medical help, a jury could conclude Defendant Williams was deliberately indifferent to a serious risk of harm and a serious medical need.

Not only do Defendants ignore the dearth of case law defining deliberate indifference, defense counsel concedes there remain genuine issues of material

fact. In his motion, counsel writes, "Although the Defendants and Plaintiff dispute the context and content of Gambel's statement to the dorm at the time in question, it is undisputed that Gambel addressed and verbally reprimanded the inmates regarding the use of the telephones within the dorm." See Motion at 3 (emphasis added). Regardless of the topic(s) Defendant Gambel addressed with the inmates (phone privileges or other dorm rules), what Defendant Gambel said could well "affect the outcome of the suit." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) ("[D]isputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

Counsel further concedes "there exist overwhelming issues with respect to credibility, weight of evidence, and the drawing of legitimate inferences from facts regarding the voluminous amount of purported evidence and testimony on which Plaintiff relies." See Motion at 5. Defendants' concession and their request for relief contradict one another. After all, as Defendants acknowledge, id. at 6 n.11, "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000).

Defendants are correct about one thing: the evidence upon which Plaintiff relies is "voluminous." Multiple inmates gave recorded, sworn

4

statements to FDLE agents of what happened in Echo Dorm (E dorm) at the Reception and Medical Center (RMC) on July 5, 2015, and their accounts permit the reasonable inference Defendants implicitly directed inmates to attack Plaintiff for being a snitch.

At about midnight, Defendant Gambel and several other corrections officers—including Williams and Tucker—entered E dorm, where Plaintiff was housed. See Pl. Ex. D at 14, 18. Defendant Gambel was visibly upset "about an inmate from [E dorm] talking to his family [on the phone] about how CO [Defendant] Williams was running the dorm." Id. at 14. Defendant Gambel told the inmates to "handle the problem or he would 'tear their shit up.'" Id. at 39. Some inmates asked Defendant Gambel to tell them the name of the inmate, "so they could take care of the issue and straighten him [the inmate] out." Id. at 15. Inmates gave differing accounts of whether Defendant Gambel disclosed Plaintiff's name at that time. Id. at 15, 21, 60, 81. See also Def. Ex. B at 55.

Inmate Haugabook gave a deposition and was interviewed by FDLE agents. At deposition, Haugabook said Defendant Gambel "pulled [him] out" of the dorm and, "in front of all the officers," told him that Plaintiff, Ladorn Singer, was the snitch. See Def. Ex. B at 34-35. At least one other inmate saw Inmate Haugabook speaking with Defendant Gambel in the CO's office after Defendant Gambel addressed the dorm. See Pl. Ex. D at 15. Inmate Haugabook

conceded Defendant Gambel did not directly say, "go kill [Singer]," but Haugabook believed Defendant Gambel and the other officers "summoned an indirect hit" on Plaintiff's life. Id. at 56, 58. Inmate Haugabook explained as follows:

> It was every officer -- ten officers inside the quad [E dorm], all to our bunk. They're talking general -- in general aspects first: Somebody here made a phone call and snitched on one of our coworkers. So everyone asked them, who. They never said. So he [Defendant Gambel] pulled me into the officers station and he told me specifically who did it, what was said on the phone call, why you're in here, and what will happen if we don't take care of it in-house; if we don't keep -- handle our problem in-house, they'll come in here and handle it for us. Exact statement from the sergeant [Gambel], exact statement.

Id. at 55.[3]

Shortly after Defendant Gambel reprimanded the inmates in E dorm, Plaintiff was beaten by multiple inmates for nearly twenty minutes. See Pl. Ex. D at 101. One inmate described the beating as "a piranha feeding." Id. at 79. During the beating, some inmates in the dorm heard Plaintiff screaming, "It was not me," or "I didn't say anything," or "I didn't do it." Id. at 12, 43, 45,

---

[3] Inmate Haugabook believes Defendant Gambel pinpointed him as the inmate who could "handle the situation" because the officers thought Haugabook was affiliated with a prison gang. See Def. Ex. B at 58. Haugabook testified, "[T]hey [the officers] tried to get me to send my gang brothers -- they thought all the gangs was my gang brothers -- to kill this dude." Id.

68, 81. At the hospital, Plaintiff was described as "unconscious and [with] no signs of life."[4] See Pl. Ex. D at 4. A picture of Plaintiff in the hospital shows just how serious and extensive his injuries were:



See Pl. Ex. X.

At his deposition, FDLE Special Agent Watts testified that his impression from the interviews he conducted was that the dorm meeting instigated or "ignited this brutal beating." See Pl. Ex. A at 35. He said the officers' "stories and some of the timelines . . . didn't add up," and he believed the officers "tried to cover up their actions that led to [Plaintiff] getting brutally beat." Id. at 8-9, 35. Agent Watts's impression is in line with those of some of the inmates he interviewed. Inmate Eugene Williams told FDLE agents that

---

[4] When interviewing Defendant Gambel, FDLE Special Agent Watts described Plaintiff's injuries: "[W]e almost have an inmate beat to death, unrecognizable, head bashed in, both eyes swol[len], boot marks on his . . . back, on his legs, loss of pretty much conscious[ness], almost dead." See Pl. Ex. F at 106.

Defendant Gambel "did not say to beat Inmate Singer, but he did suggest it." See Pl. Ex. D at 82. Inmate Lonnie Smith said "the guards were responsible for the altercation," and Inmate Robert Kevin Sawyer concurred, saying he "understood the [Sergeant's] comments as an order for the occupants of the dormitory to punish the individual that had been complaining to his family." Id. at 52, 56. Inmates Smith and Sawyer also claimed to have heard Defendant Gambel tell the inmates, "People slip and fall all the time." Id.

Viewing the evidence in the light most favorable to Plaintiff, he demonstrates there remain genuine issues of material fact. Accordingly, Defendants Gambel, Tucker, and Williams's motion for summary judgment (Doc. 47) is **DENIED**. This case will proceed to trial.

**DONE AND ORDERED** at Jacksonville, Florida, this 19th day of July 2021.

_____
BRIAN J. DAVIS
United States District Judge

Jax-6
c:
Counsel of Record